**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

| | | |
|---|---|---|
| ELI LILLY AND COMPANY | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | CIVIL ACTION No. 1:26-cv-00347-MJT |
| v. | § | |
| | § | JUDGE MICHAEL J. TRUNCALE |
| LEGENDARY PEPTIDES, LLC | § | |
| | § | |
| *Defendant*. | § | |

# PLAINTIFF ELI LILLY AND COMPANY'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS UNDER FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1) AND 12(b)(6)

**TABLE OF CONTENTS**


**I. INTRODUCTION .......... 1**

**II. SUMMARY OF ALLEGATIONS .......... 4**

A. Lilly and Its Medicines .......... 4

B. Legendary and Its Peptides .......... 5

C. Legendary's Illegal Sales Harm Lilly .......... 6

D. Stage of the Proceedings .......... 7

**III. RESPONSE TO STATEMENT OF ISSUES .......... 7**

**IV. LEGAL STANDARD .......... 8**

**V. ARGUMENTS .......... 9**

A. Lilly Alleges Three Injuries That Establish Standing to Bring Unfair Competition Claims .......... 9

1. Legendary's Retatrutide Diverts Sales of Lilly's Medicines. .......... 9

2. Legendary Poisons the Market for Lilly's Retatrutide. .......... 15

3. Legendary's Retatrutide Harms Lilly's Reputation. .......... 19

B. Legendary's Illegal Sales Are Actionable .......... 23

**VI. CONCLUSION .......... 26**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Home Prods. Corp. v. Johnson & Johnson*,
436 F. Supp. 785 (S.D.N.Y. 1977)....2, 14

*Ambach v. French*,
216 P. 3d 405 (Wash. 2009)....4, 20

*Amgen, Inc. v. F. Hoffmann-La Roche Ltd.*,
480 F. Supp. 2d 462 (D. Mass. 2007)....17

*Andrx Pharms., Inc. v. Biovail Corp. Int'l*,
256 F.3d 799 (D.C. Cir. 2001)....3, 17

*AstraZeneca Pharms. LP v. Becerra*,
719 F. Supp. 3d 377 (D. Del. 2024)....18

*Barber v. Bryant*,
860 F.3d 345 (5th Cir. 2017)....20

*Bay Area Unitarian Universalist Church v. Ogg*,
185 F.4th 523 (5th Cir. 2026) (en banc)....20

*Bost v. Illinois State Bd. of Elections*,
607 U.S. 71 (2026)....4, 20

*Brown v. De La Cruz*,
156 S.W.3d 560 (Tex. 2004)....24

*Carlin v. Davidson Fink LLP*,
852 F.3d 207 (2d Cir. 2017)....12

*Cruz v. Andrews Restoration, Inc.*,
364 S.W.3d 817 (Tex. 2012)....26

*Decorative Ctr. of Houston, L.P. v. Direct Response Publications, Inc.*,
208 F. Supp. 2d 719 (S.D. Tex. 2002)....25

*Diascience Corp. v. Blue Nile, Inc.*,
2009 WL 1938970 (S.D.N.Y. 2009)....14

*Discover Bank v. Morgan*,
363 S.W.3d 479 (Tenn. 2012)....16

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,
717 F.3d 1336 (Fed. Cir. 2013)....22

*El Paso Disposal, LP v. Ecube Labs Co.*,
2025 WL 1766310 (W.D. Tex. June 26, 2025) ....11

*Eli Lilly & Co. v. Adonis Health, Inc.*,
2025 WL 2721684 (N.D. Cal. Sept. 24, 2025) ....11, 14, 15

*Eli Lilly & Co. v. Aios, Inc.*,
2026 WL 836624 (N.D. Cal. Mar. 26, 2026)....14

*Eli Lilly & Co. v. AP Max Inc. d/b/a Southend Pharmacy*,
No. 4:25-cv-05051 (S.D. Tex. Apr. 17, 2026)....24

*Eli Lilly & Co. v. Mochi Health Corp.*,
2025 WL 2998166 (N.D. Cal. Oct. 24, 2025)....23

*Eli Lilly & Co. v. Mochi Health Corp.*,
2026 WL 1076831 (N.D. Cal. Apr. 20, 2026) ....14, 22, 23

*Eli Lilly & Co. v. Revive Rx, LLC*,
812 F. Supp. 3d 708 (S.D. Tex. 2025) ....15, 24, 25

*Eli Lilly & Co. v. Willow Health Services, Inc.*,
2026 WL 639976 (C.D. Cal. Feb. 3, 2026)....15

*Eli Lilly & Co. v. Willow Health Servs., Inc.*,
2025 WL 2631620 (C.D. Cal. Aug. 29, 2025)....14, 15

*Featherstone v. Indep. Serv. Station Ass'n of Texas*,
10 S.W.2d 124 (Tex. Civ. App.—Dallas 1928, no writ) ....24, 26

*Fleming v. Janssen Pharms., Inc.*,
186 F. Supp. 3d 826 (W.D. Tenn. 2016)....20

*French v. Applied Psychology Grp. of Texoma, PA*,
245 F. Supp. 3d 824 (E.D. Tex. 2017)....8, 9, 20

*Geiger v. C&G of Groton, Inc.*,
424 F. Supp. 3d 276 (D. Conn. 2019)....20

*Great Lakes Dredge & Dock Co. v. Magnus*,
128 F.4th 678 (5th Cir. 2025) ....18

*Harold H. Huggins Realty, Inc. v. FNC, Inc.*,
634 F.3d 787 (5th Cir. 2011) ....10, 14

*Hecht v. Pro-Football, Inc.*,
570 F.2d 982 (D.C. Cir. 1977) ....................17

*Hinchcliffe v. American Motors Corp.*,
440 A.2d 810 (Conn. 1981) ....................16

*Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Ga., Inc.*,
892 F.3d 719 (5th Cir. 2018) ....................8, 22

*Johnson & Johnson v. Carter-Wallace, Inc.*,
631 F.2d 186 (2d Cir. 1980)....................14

*Keating v. Nordstrom, Inc.*,
2019 WL 7160384 (D. Alaska Nov. 8, 2019)....................16

*Lane v. Halliburton*,
529 F.3d 548 (5th Cir. 2008) ....................8

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014).................... *passim*

*Little v. KPMG LLP*,
575 F.3d 533 (5th Cir. 2009) ....................12

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992).................... *passim*

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990)....................9

*Meese v. Keene*,
481 U.S. 465 (1987)....................20, 21

*Montes v. SPARC Group LLC*,
586 P.3d 999 (Wash. 2026) (en banc)....................20, 21

*Morrison v. Quarrington*,
2024 WL 2858838 (Tex. App.—Tyler May 15, 2024, pet. denied) ....................24

*Nat'l Infusion Ctr. Ass'n v. Becerra*,
116 F.4th 488 (5th Cir. 2024) ....................18

*Nichols v. McKinney*,
553 S.W.3d 523 (Tex. App.—Waco 2018, pet. denied) ....................24

*Novo Nordisk A/S v. Ikon Health LLC*,
2026 WL 196475 (E.D. Wash. Jan. 26, 2026) ....................15

*Novo Nordisk Inc. v. Axtell's Rite-Value Pharmacy, Inc.*,
2026 WL 1684178 (E.D. Tex. June 10, 2026)....13

*Obesity Rsch. Inst., LLC v. Fiber Rsch. Int'l, LLC*,
165 F. Supp. 3d 937 (S.D. Cal. 2016)....11, 22

*Obesity Rsch. Inst., LLC v. Fiber Rsch. Int'l, LLC*,
310 F. Supp. 3d 1089 (S.D. Cal. 2018)....20

*Perry v. S.N.*,
973 S.W.2d 301 (Tex. 1998)....24

*Precision Links Inc. v. USA Prods. Grp., Inc.*,
2009 WL 801781 (W.D.N.C. Mar. 25, 2009)....20

*Reliable Ambulance Serv., Inc. v. Mercy Hosp. of Laredo*,
2003 WL 21972724 (Tex. App.—San Antonio Aug. 20, 2003, pet. denied)....25

*Retrophin, Inc. v. Questcor Pharms., Inc.*,
41 F. Supp. 3d 906 (C.D. Cal. 2014)....17

*Schoellkopf v. Pledger*,
778 S.W.2d 897 (Tex. App.—Dallas 1989, writ denied)....25

*Scilex Pharms. Inc. v. Sanofi-Aventis U.S. LLC*,
2021 WL 11593043 (N.D. Cal. Aug. 16, 2021)....11

*Seattle Children's Hosp. v. Akorn, Inc.*,
2011 WL 6378838 (N.D. Ill. Dec. 20, 2011)....17

*Sensory Path Inc. v. Fit & Fun Playscapes, LLC*,
2021 WL 4768247 (N.D. Miss. Oct. 12, 2021)....12

*Sewell v. Monroe City Sch. Bd.*,
974 F.3d 577 (5th Cir. 2020)....8

*Simon v. E. Ky. Welfare Rights Org.*,
426 U.S. 26 (1976)....13

*Tawfilis v. Allergan, Inc.*,
157 F. Supp. 3d 853 (C.D. Cal. 2015)....18

*Taylor Pub. Co. v. Jostens, Inc.*,
216 F.3d 465 (5th Cir. 2000)....23, 25

*Texas Med. Res., LLP v. Molina Healthcare of Texas, Inc.*,
659 S.W.3d 424 (Tex. 2023)....24

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 20, 22

*Truman v. United States*,
26 F.3d 592 (5th Cir. 1994) .......... 9

*United States ex rel. Univ. Loft Co. v. Avteq, Inc.*,
2015 WL 13548950 (W.D. Tex. Dec. 22, 2015) .......... 12

*Upjohn Co. v. Riahom Corp.*,
641 F. Supp. 1209 (D. Del. 1986) .......... 3, 17, 19

*ViroPharma, Inc. v. Hamburg*,
777 F. Supp. 2d 140 (D.D.C. 2011), *aff'd*, No. 11-5143 (D.C. Cir. Mar. 21, 2012) .......... 18

*W. Rsrv. Medtec Servs., LLC v. Stryker Corp.*,
2019 WL 13191641 (S.D. Tex. May 13, 2019) .......... 24, 25

*Warren Tech., Inc. v. UL LLC*,
2018 WL 10550927 (S.D. Fla. July 2, 2018) .......... 12

*Woods v. Littleton*,
554 S.W.2d 662 (Tex. 1977) .......... 26

**Rules**

Fed. R. Civ. P. 12 .......... 7, 8, 24

# I. INTRODUCTION

For nearly a century, drug manufacturers have had to obtain approval from the U.S. Food and Drug Administration ("FDA") before selling a product to patients. This premarket approval process ensures that Americans receive only clinically studied medicines that FDA has determined to be both safe and effective for use under defined conditions. Eli Lilly and Company ("Lilly") has invested billions of dollars and years of effort to develop some of the most remarkable scientific breakthroughs in recent medicine under this process, including FDA-approved MOUNJARO® and ZEPBOUND® (both using the active pharmaceutical ingredient ("API") tirzepatide), and FOUNDAYO™ (using the API orforglipron). These groundbreaking medicines treat obesity, type 2 diabetes, and related metabolic conditions by targeting receptors for glucagon-like peptide-1 ("GLP-1") and, in the case of the tirzepatide medicines, glucose-dependent insulinotropic polypeptide ("GIP").

Lilly has also developed a novel investigational molecule called retatrutide, which targets the GLP-1 and GIP receptors in addition to a third category of glucagon receptors, and which Lilly is studying for its potential to treat some of the same conditions. Retatrutide has already produced powerful data in multiple Phase 3 clinical trials, generating significant consumer interest. But retatrutide is still being investigated; no FDA-approved medicine containing retatrutide exists, and selling retatrutide for human use is illegal and dangerous.

Various states' laws reinforce this premarket approval requirement by independently prohibiting the sale of any unapproved drug within that state. Yet Legendary Peptides, LLC ("Legendary") sells retatrutide anyway. It sells retatrutide directly to consumers nationwide without a prescription, pretextually labeling it for "research use only" while marketing it for human use. Legendary sells retatrutide to customers seeking treatment for some of the same conditions Lilly's FDA-approved medicines treat. Legendary thus free rides on Lilly's innovation, research,

and development while bearing none of the costs. Its customers bear the risk: buyers in the dangerous and growing retatrutide black market are injecting themselves with substances of unknown composition, purity, potency, and sterility. Lilly is suing under state unfair competition law to end the illegal sales harming not only consumers but also Lilly and its products.

Legendary all but concedes that it is prohibited from selling retatrutide. But Legendary brazenly argues that, since no one may lawfully sell retatrutide for human use, Lilly cannot be injured when Legendary sells it anyway. But the illegality of Legendary's sales does not immunize them. Legendary's scheme inflicts three concrete injuries on Lilly, each of which independently establishes both Article III and state statutory standing.

*First*, Legendary's illegal sales divert consumers from Lilly's FDA-approved medicines—the "paradigmatic direct injury." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 138 (2014). Legendary calls this a suit over a product Lilly "does not and cannot lawfully sell," Dkt. No. 12 ("Mot.") 2, but Legendary is selling its illegal retatrutide to an overlapping market with the medicines Lilly can and does sell today. Lilly's FDA-approved medicines MOUNJARO®, ZEPBOUND®, and FOUNDAYO™ treat "obesity, type 2 diabetes, and/or related metabolic conditions"—some of the same conditions consumers are seeking to alleviate with Legendary's illegal retatrutide. Compl. ¶¶ 25–29, 44, 60–61. And Lilly's medicines treat those conditions by targeting one or two of the hormone receptors that retatrutide also targets. *Id.* Legendary therefore sells to "the same potential customers" Lilly serves, and Lilly has alleged that consumers who qualify for Lilly's medicines are abandoning them for black-market retatrutide. *Id.* ¶¶ 60-61. Simply put, Lilly's standing does not have to be based on selling "the same molecule." Mot. 12, 17; *see, e.g.*, *Am. Home Prods. Corp. v. Johnson & Johnson*, 436 F. Supp. 785, 787, 791

(S.D.N.Y. 1977) (finding standing in a case involving Anacin (aspirin and caffeine) and Tylenol (acetaminophen)).

*Second*, by supplying consumers' first and only experiences with retatrutide, Legendary is poisoning the well for Lilly's own forthcoming retatrutide medicines, which it plans to submit for FDA approval in early 2027.[1] That harm is happening now: consumers are already suffering adverse events, blaming the molecule, and turning away from retatrutide for good. Legendary argues this injury is speculative, since Lilly's medicines are not yet FDA-approved, but courts routinely find standing for injury to as yet unapproved products. *See, e.g.*, *Upjohn Co. v. Riahom Corp.*, 641 F. Supp. 1209, 1225 n.18 (D. Del. 1986) (plaintiff "still may obtain relief . . . although [its product] is not yet on the market (and may never be if it does not win FDA approval)"). What matters is whether Lilly has shown "intent and preparedness to enter the market," and Lilly's decade of work on and investment in retatrutide more than make that demonstration. *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 807–08 (D.C. Cir. 2001).

*Third*, Legendary harms Lilly's own reputation and goodwill. Lilly developed retatrutide, and the entire illegal market for products claiming to be retatrutide exists only because of black market sellers attempting to ride the coattails of Lilly's ongoing clinical studies. Each vial of unapproved retatrutide Legendary sells for human use risks harming a consumer, and consumers are likely to attribute such harms to Lilly, damaging its brand and public confidence in Lilly's product development. Compl. ¶¶ 57, 64. Lilly has already had to publicly warn consumers about black-market retatrutide. *Id.* ¶ 38. Those reputational harms "are classic Article III injuries" and

---

[1] Lilly, *News Release: Lilly's triple agonist, retatrutide, delivered substantial weight loss and A1C reduction, underscoring its potential promise for people with obesity and type 2 diabetes* (Sept. 29, 2026), https://investor.lilly.com/news-releases/news-release-details/lillys-triple-agonist-retatrutide-delivered-substantial-weight ("Lilly plans to submit a Biologics License Application (BLA) in Q1 2027 to the U.S. Food and Drug Administration.").

cognizable injuries under state unfair competition laws. *Bost v. Illinois State Bd. of Elections*, 607 U.S. 71, 78 (2026); *see also, e.g.*, *Ambach v. French*, 216 P. 3d 405, 408 (Wash. 2009) (explaining that "loss of professional or business reputation" is a cognizable injury under the Washington Consumer Protection Act).

The Court should deny Legendary's Motion to Dismiss in full.

## II. SUMMARY OF ALLEGATIONS

### A. Lilly and Its Medicines

Lilly is an international medicine company that has pioneered life-changing discoveries for more than 150 years. Compl. ¶ 24. Lilly's MOUNJARO®, ZEPBOUND®, and FOUNDAYO™ medicines are groundbreaking examples of Lilly's commitment to developing innovative treatments to meet critical patient needs. *Id.* ¶¶ 18, 26–27. Each contains one of two molecules Lilly discovered: tirzepatide (MOUNJARO® and ZEPBOUND®) or orforglipron (FOUNDAYO™). *Id.* ¶¶ 25–27. These molecules both target GLP-1 receptors (with tirzepatide additionally targeting GIP receptors), and the medicines Lilly developed using them treat conditions such as type 2 diabetes, obesity, and obstructive sleep apnea. *Id.* ¶¶ 26–27. Lilly is the only lawful source of FDA-approved tirzepatide or orforglipron products. *Id.* ¶ 28.

Since 2019, Lilly has been testing a third molecule, retatrutide, through FDA's clinical trial process. *Id.* ¶¶ 29–30. Like tirzepatide and orforglipron, retatrutide targets GLP-1 receptors (along with GIP receptors and glucagon receptors), and Lilly is studying it to treat many of the same conditions as its approved medicines, including obesity, type 2 diabetes, and obstructive sleep apnea. *Id.* ¶ 29. Developing an FDA-approved medicine is an arduous and costly process, typically taking 10–15 years and costing, on average, $2.6 billion per approved medicine. *Id.* ¶ 20.

The process is also carefully controlled. Before testing a new molecule in humans, a sponsor must have an effective Investigational New Drug application supported by detailed

preclinical data, manufacturing information, and clinical protocols. *Id.* ¶ 17. The drug is then "clinically tested through a rigorous series of studies designed to determine whether the medication is safe and effective," and only after that "years-long clinical trial process" may the sponsor *seek* approval for general commercial sale. *Id.* ¶¶ 17–18. Approval is granted only if a multi-disciplinary review concludes that the drug's health benefits outweigh its known risks in treating particular conditions. *Id.* ¶ 18. Lilly is authorized to and is currently conducting human clinical trials for retatrutide. *Id.* ¶¶ 29–31.

Retatrutide's clinical trials "have produced powerful data," including a recent trial in which adults living with obesity lost an average of approximately 70 pounds over 80 weeks. *Id.* ¶ 4. In July 2026, Lilly announced that retatrutide had been "successful in two additional Phase 3 obesity trials, delivering significant improvements in weight and A1C." *Id.* ¶ 4 n.3. Those results have generated significant consumer interest. *Id.* ¶ 33. But FDA has authorized only carefully controlled clinical investigation—not general commercial sale—and no retatrutide medicine has yet been approved. *Id.* ¶¶ 17, 31–32. Any sale of retatrutide to consumers for human use is therefore illegal. *Id.* ¶¶ 4, 32.

**B. Legendary and Its Peptides**

Legendary is a Texas company selling "GLP3 (R)," a common codename illegal sellers use for black-market retatrutide. *Id.* ¶ 44. Although it claims its "GLP3 (R)" is for "research use only," Legendary in fact markets and sells retatrutide solely for human use, making all of its retatrutide sales illegal. *Id.* ¶¶ 1, 43–48. For example, one Legendary Facebook post tied the company's products to "New Year's resolutions" and urged consumers to "[i]nvest in tools that support your efforts behind the scenes while you show up, do the work, and stay disciplined." *Id.* ¶ 48 & n.23. Consumers have responded. One customer, for example, posted a photo of a vial labeled "GLP3 (R)" and said they had been buying from Legendary since January 2026. *Id.* ¶ 49.

Another reported that after months of use, "[m]y results have exceeded my expectations!" *Id.* ¶ 50. Legendary's motion does not deny, and expressly "does not ask the Court to resolve," whether it markets retatrutide for human use. Mot. 4–5.

Legendary participates in a black market built to profit from consumer interest in retatrutide fueled by Lilly's strong clinical results. Compl. ¶¶ 33–34. That market is dangerous. FDA has issued at least 16 retatrutide-related warning letters and has warned consumers "not to purchase" retatrutide labeled "for research purposes" because such products are of "unknown quality and may be harmful to their health." *Id.* ¶¶ 36–37. Consumers report emergency-room visits and at least two hospitalizations after using black-market retatrutide, including because of "bacteria" in products that "aren't made in regulated or sterile labs." *Id.* ¶¶ 40–41 & n.18.

### C. Legendary's Illegal Sales Harm Lilly

Legendary's illegal sales divert consumers from Lilly's FDA-approved medicines. *Id.* ¶¶ 6, 60–61. Lilly's medicines treat, among other conditions, "obesity, type 2 diabetes, and/or related metabolic conditions." *Id.* ¶ 61. But some consumers who meet the criteria for Lilly's obesity-management medications are choosing illegal retatrutide *instead of* Lilly's FDA-approved medicines, citing lower cost and perceived superior efficacy. *Id.* ¶ 60. One consumer, for example, wrote that it was "hard to justify staying on Mounjaro long term" when illegal retatrutide was "about half the cost"; another, who had lost 169 pounds on tirzepatide, asked whether "switching over to reta" would help her reach her remaining goal. *Id.* & n.31–32. Legendary's illegal sales thus "are in direct competition with Lilly and are costing Lilly sales of its FDA-approved obesity-management medicines." *Id.* ¶ 61.

Legendary's sales also undermine the market for Lilly's own retatrutide drug, which has already succeeded in multiple Phase 3 trials and which Lilly is advancing through the FDA approval process. *Id.* ¶¶ 4 & n.3, 62. Because no retatrutide medicine is lawfully available,

"consumers' first experiences with retatrutide are occurring exclusively through black-market sellers like Legendary Peptides." *Id.* ¶ 62. When consumers suffer adverse events—"as many already have"—they often blame not the seller but "all products containing retatrutide." *Id.* ¶ 62. Those consumers are "unlikely ever to try retatrutide again," and their public accounts "will deter other potential consumers" as well. *Id.* ¶¶ 62–63 & n.33. "Each adverse event caused by Legendary Peptides' illegal products thus represents not only a current injury to the consumer, but a permanent loss of future Lilly patients." *Id.* ¶ 62. "By the time Lilly brings its FDA-approved retatrutide medicine to market," Legendary and sellers like it will have conditioned the public "to associate retatrutide with danger and harm." *Id.* ¶ 7; *see id.* ¶ 63.

Legendary also harms Lilly's reputation and goodwill. Lilly has been publicly associated with retatrutide for a decade: Lilly developed the molecule, is advancing it through clinical trials, and has announced promising results attracting significant consumer interest. *Id.* ¶¶ 29–30, 33. Those who experience adverse effects from black-market retatrutide are therefore likely to attribute those harms "to Lilly, damaging Lilly's brand and the public's confidence in Lilly's products and pipeline." *Id.* ¶ 64.

### D. Stage of the Proceedings

Lilly sued on August 12, 2026, asserting claims under the consumer-protection and unfair-trade-practices statutes of seven states and under Texas common law, because Legendary unlawfully sells unapproved retatrutide in violation of those states' laws. Compl. ¶¶ 68–132. Legendary moved to dismiss under Rules 12(b)(1) and 12(b)(6). *See* Mot.

## III. RESPONSE TO STATEMENT OF ISSUES

Lilly disagrees with Legendary's Statement of Issues, which incorporates assertions contradicted by the Complaint's well-pleaded allegations. Properly framed, the issues the Court must decide are:

1. Whether Lilly has Article III and statutory standing to sue Legendary where Legendary's black-market sales of an unapproved drug containing retatrutide, a molecule Lilly discovered, injure Lilly by (a) diverting consumers from the lawful medicines Lilly offers to unlawful retatrutide, Compl. ¶¶ 60–61; (b) poisoning the well for Lilly's own future retatrutide medicine by giving consumers an inferior and dangerous experience with retatrutide, *id.* ¶¶ 62–63; and (c) free-riding on and tarnishing Lilly's brand by associating its groundbreaking discovery with FDA warning letters and adverse health outcomes, *id.* ¶¶ 36–37, 40, 64–65.

2. Whether Lilly states a claim for unfair competition under Texas common law where Legendary's violation of the Texas Food, Drug, and Cosmetic Act interferes with Lilly's ability to conduct its business and there is no evidence of contrary legislative intent. *Id.* ¶¶ 117–22.

## IV. LEGAL STANDARD

"A motion to dismiss for failure to state a claim concerns the 'formal sufficiency of the statement of the claim for relief,' not a lawsuit's merits." *Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 582 (5th Cir. 2020). A claim should survive a Rule 12(b)(6) motion to dismiss when it "state[s] a claim to relief that is plausible on its face." *Id.* When reviewing a Rule 12(b)(6) motion to dismiss, the court must "assume that the facts the complaint alleges are true and view those facts in the light most favorable to the plaintiff." *Id.* Pleadings based on information and belief are generally permitted where the facts are particularly within the defendant's knowledge. *See, e.g.*, *Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 730 (5th Cir. 2018).

A motion to dismiss for lack of jurisdiction should be granted "only if it appears beyond doubt the plaintiff cannot prove a plausible set of facts in support of her claim." *French v. Applied Psychology Grp. of Texoma, PA*, 245 F. Supp. 3d 824, 825 (E.D. Tex. 2017) (citing *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008)). The court must again accept all well-pleaded

allegations in the complaint as true and construe those allegations in the light most favorable to the plaintiff. *Id.* (citing *Truman v. United States*, 26 F.3d 592, 594 (5th Cir. 1994)). As to allegations regarding injury in particular, "at the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)).

## V. ARGUMENTS

### A. Lilly Alleges Three Injuries That Establish Standing to Bring Unfair Competition Claims

Legendary's illegal retatrutide sales harm Lilly in three ways, each independently sufficient to confer statutory and Article III standing: they divert sales of Lilly's already-available medicines, poison the well for Lilly's future retatrutide products, and harm Lilly's overall reputation.

#### 1. *Legendary's Retatrutide Diverts Sales of Lilly's Medicines.*

Legendary's illegal sales harm Lilly by directly undercutting sales of Lilly's existing approved medicines. Lilly's FDA-approved medicines treat some of the same conditions black-market consumers use retatrutide to address: "obesity, type 2 diabetes, and/or related metabolic conditions." Compl. ¶ 61. And they treat those conditions in overlapping ways, by targeting hormone receptors in the body. *Id.* ¶¶ 25–29, 61. In fact, Legendary's illegal retatrutide purports to target two of the same hormone receptors targeted by Lilly's FDA-approved MOUNJARO® and ZEPBOUND®. The causal chain is therefore simple and direct. If Legendary stopped selling its illegal retatrutide, at least some of its customers who want "obesity-management treatment" targeting those same hormone receptors would turn to Lilly's lawful medicines to provide that treatment. *Id.* ¶¶ 4, 44, 49, 61; *see also id.* ¶ 6. Legendary's products and Lilly's medicines thus

"target the same consumer pool," and Legendary's "illegal sales are in direct competition with Lilly and are costing Lilly sales of its FDA-approved obesity-management medicines." *Id.* ¶ 61. That is a textbook injury for both Article III and statutory standing. *Lexmark,* 572 U.S. at 125, 138 ("[D]iversion of sales to a direct competitor" is the "paradigmatic direct injury"); *see also* Mot. 16–18 (citing *Lexmark* for the statutory standing proximate causation standard). Lilly need not identify specific consumers lost to Legendary at the pleading stage. *See Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 803 n.44 (5th Cir. 2011) (allegation that more lenders would have used plaintiffs' services absent defendant's competing product "states a plausible, non-speculative claim for damages" although plaintiff did not identify specific lenders).

Legendary argues that this harm is too speculative for Article III standing because the Complaint supposedly "says nothing about" whether Legendary's customers would qualify for Lilly's medicines. Mot. 11. Not so. To begin with, retatrutide is a triple agonist, and two of the three hormone receptors it targets overlap with those targeted by Lilly's FDA-approved medicines. There is nothing speculative about the conclusion that a retatrutide purchaser would turn to MOUNJARO® or ZEPBOUND® since they use overlapping mechanisms of action. What's more, Lilly's complaint specifically alleges that Legendary has marketed products to consumers as "tools" related to "#fitness" and a "#healthylifestyle," and it alleges that Legendary's retatrutide customers are using Legendary's so-called "research use only" product for personal use, as reflected in public reviews. Compl. ¶¶ 45, 48–49. The Complaint also explicitly alleges that Legendary's customers would otherwise turn to Lilly's lawful medicines that target one or two of the same hormone receptors to treat overlapping conditions. *Id.* ¶¶ 60–61. As Lilly explains, Legendary is part of a "dangerous and growing black market" in which "consumers *who meet the criteria for obesity-management medications* are choosing illegal retatrutide over Lilly's FDA-

approved obesity-management medicines." *Id.* (emphasis added). Legendary's only response to this allegation is to complain that Lilly does not tie a specific "qualifying patient to Legendary." Mot. 11. But that sort of specificity is not required at the pleading stage. *See El Paso Disposal, LP v. Ecube Labs Co.*, 2025 WL 1766310, at *7 (W.D. Tex. June 26, 2025) (holding allegations of "loss of customers and reduced profits" sufficient to plead statutory standing at the pleading stage "notwithstanding that [plaintiffs] do not allege the loss of a specific customer"); *Lujan*, 504 U.S. at 561 (explaining that at the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice" to establish standing); *Obesity Rsch. Inst., LLC v. Fiber Rsch. Int'l, LLC*, 165 F. Supp. 3d 937, 947 (S.D. Cal. 2016) (finding statutory standing based on allegation that plaintiff had been "injured by the loss of good will" without specific identified consumers). That some consumers are abandoning Lilly medicines they already take—and for which they necessarily qualified—in favor of illegal retatrutide is enough, and that harm is not hypothetical. *E.g.*, Compl. ¶ 60 (consumer finding it "hard to justify staying on Mounjaro long term"). These allegations show that at least some Legendary customers would otherwise have bought a Lilly medicine. That is all Lilly must allege at this stage.

In reality, Legendary's demand for more specificity tying specific Legendary sales to Lilly's lost customers is an attempt to immunize its illegal conduct because it is just "one seller in a 'dangerous and growing black market.'" Mot. 18. Courts repeatedly reject that argument. *See Scilex Pharms. Inc. v. Sanofi-Aventis U.S. LLC*, 2021 WL 11593043, at *4 (N.D. Cal. Aug. 16, 2021) (rejecting arguments regarding the "'crowded market' of OTC and prescription lidocaine patches" because the plaintiff "is not required to show that [Defendants'] advertisements were the only reason for reduced [plaintiff's] sales"); *Eli Lilly & Co. v. Adonis Health, Inc.*, 2025 WL 2721684, at *4 (N.D. Cal. Sept. 24, 2025) (rejecting argument that Lilly failed to allege lost sales

because "the weight-loss market is large and contains numerous competing products," where defendant competed in the same relevant market). That conclusion is even stronger here, where Legendary is pointing to others who engage in the same *illegal* conduct. Its argument implies that the more illegal sellers harm Lilly, the less recourse Lilly has against them. That is not the law. *Carlin v. Davidson Fink LLP*, 852 F.3d 207, 217 (2d Cir. 2017) (finding that a party is not "insulate[d] … from liability merely because others in the industry engage in the same [allegedly illegal] practice"); *Sensory Path Inc. v. Fit & Fun Playscapes, LLC*, 2021 WL 4768247, at *5 (N.D. Miss. Oct. 12, 2021) ("[A]n alleged [unlawful seller] cannot absolve themselves from liability by pointing to two other alleged [unlawful sellers].").

Legendary's case law does not help it either. Legendary tries to support its argument with *Little v. KPMG LLP*, 575 F.3d 533 (5th Cir. 2009), but the facts in that case are far afield from the allegations here. Plaintiffs' injury in that case depended on a string of counterfactual hypotheticals: *if* regulators had revoked defendant's license, and *if* defendant failed to promptly cure the issue and restore its license, and *if* some of defendant's clients had chosen to switch accountants rather than wait for the restoration, and *if* those clients would have chosen plaintiffs over hundreds of other accountants, then plaintiffs were injured. *Id.* at 536–41. Lilly's injury requires no such counterfactual world or speculation about what consumers might do in the future. Lilly's allegations here are that, because Legendary *is* already selling black-market retatrutide, its customers are already being diverted from Lilly's FDA-approved medicines, causing Lilly harm. Compl. ¶¶ 60–61.

And in *Warren Tech., Inc. v. UL LLC*, and *United States ex rel. Univ. Loft Co. v. Avteq, Inc.*, plaintiffs lacked standing because they failed to explain how defendants' conduct would result in lost sales. 2018 WL 10550927, at *6 (S.D. Fla. July 2, 2018); 2015 WL 13548950, at *9 (W.D.

Tex. Dec. 22, 2015). Lilly, however, does just that, explaining that Legendary markets and sells its retatrutide to the same consumer pool as Lilly, diverting sales from its FDA-approved medicines. Compl. ¶ 61. Finally, *Simon v. E. Ky. Welfare Rights Org.* has nothing to do with diversion of sales. 426 U.S. 26 (1976). The plaintiffs in *Simon* claimed that an IRS ruling "encouraged" non-party hospitals "to deny services to indigents." *Id.* at 42. The Court found that whether plaintiffs' alleged denial of care was at all related to the IRS's ruling was speculative. *Id.* at 42–43. Lilly's allegations are far more direct than that.

In fact, the *only* on-point case that Legendary cites is one that found standing for a drug manufacturer bringing nearly identical claims against a seller of knockoff weight loss drugs like Legendary. In *Novo Nordisk Inc. v. Axtell's Rite-Value Pharmacy, Inc.*, Judge Kernodle held that Novo Nordisk, the manufacturer of Ozempic® and Wegovy®, had standing to assert claims under many of the same state unfair competition laws against a company selling unapproved knockoff versions of its drugs. 2026 WL 1684178, at *1, *3 (E.D. Tex. June 10, 2026). Legendary attempts to distinguish *Axtell* because the defendant sold the same drug as Novo in that case. Mot. 12. But while the court acknowledged that the defendant's drugs contained the same molecule as Novo's, it did not hold that this was *necessary* to establish standing—its analysis turned on the harm to Novo, not the chemical composition of the products. *Axtell*, 2026 WL 1684178, at *3.

In disregard of that case law, Legendary argues that unless the products are identical, "Lilly cannot invoke a 1:1 relationship" between its losses and Legendary's sales. Mot. 16–17. But Lilly need not do so: it has never been the law that competitors must sell identical products to experience competitive injury. *Lexmark* invoked a 1:1 relationship only as a second, independent basis for finding proximate cause for a plaintiff that was *not* a direct competitor, in "relatively unique circumstances." 572 U.S. at 138–40. A "1:1 relationship" is not required where the defendant's

conduct "target[s] the same segment of the market from which Lilly [stands] to profit." *Eli Lilly & Co. v. Mochi Health Corp.*, 2026 WL 1076831, at *11 (N.D. Cal. Apr. 20, 2026) (discussing *Lexmark*, 572 U.S. at 122–23). Thus, courts routinely find both Article III standing and proximate causation for statutory standing where the competing products are not identical. *See*, *e.g.*, *Huggins*, 634 F.3d at 795 & n.2 (lost business to defendant's electronic real-estate-valuation database, which competed with plaintiffs' in-person appraisals, "clearly satisf[ied]" Article III); *Diascience Corp. v. Blue Nile, Inc.*, 2009 WL 1938970, at *4 (S.D.N.Y. 2009) (finding standing under statutory proximate-causation requirements based on "a causal nexus between [defendant's] alleged false advertising concerning colored gemstones and [plaintiff's] lost diamond sales"); *Eli Lilly & Co. v. Aios, Inc.*, 2026 WL 836624, at *2, *6 (N.D. Cal. Mar. 26, 2026) (finding statutory standing where Lilly's sales of FDA-approved tirzepatide were injured by sales of compounded tirzepatide with additives); *Adonis*, 2025 WL 2721684, at *5 (similar); *Am. Home Prods. Corp.*, 436 F. Supp. at 787, 791 (finding statutory standing in a case involving the manufacturers of Anacin (aspirin and caffeine) and Tylenol (acetaminophen)); *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 190–91 (2d Cir. 1980) (finding Lanham Act standing where plaintiff, a manufacturer of baby oil and lotion, alleged lost sales based on a competitor's advertisement of hair-removal depilatory products because "[f]or each new depilatory user, a corresponding decline in the use of shaving products such as oils and lotions appears probable"); *see also Eli Lilly & Co. v. Willow Health Servs., Inc.,* 2025 WL 2631620, at *4 (C.D. Cal. Aug. 29, 2025) (explaining that Lilly and Willow are direct competitors notwithstanding differences in their tirzepatide products' formulations and routes of administration). The only relevant question for standing is whether the competing sales are causing harm to the plaintiff, not whether the products are identical.

Legendary also relies on *Willow* to suggest that a "physician's prescribing decision" may break the causal chain. Mot. 17 (citing *Eli Lilly & Co. v. Willow Health Services, Inc.*, 2026 WL 639976, at *7–8 (C.D. Cal. Feb. 3, 2026)).[2] But *Willow* involved compounded drugs, which require a prescription. *Id.* No prescriber stands between Legendary and its customers: Legendary is a black-market seller and does not fill prescriptions. Compl. ¶¶ 11–12. And in any case, *Willow* was incorrect, as numerous subsequent courts have pointed out. If a physician's decision always breaks the causal chain, no plaintiff could ever establish standing to sue over prescription drugs, a conclusion subsequent courts have repeatedly rejected. *See, e.g., Adonis,* 2025 WL 2721684, at *4 (rejecting the argument that "the provider's decision to prescribe" breaks the causal chain); *Novo Nordisk A/S v. Ikon Health LLC*, 2026 WL 196475, at *3 (E.D. Wash. Jan. 26, 2026) (rejecting argument that "a doctor's prescription" is "an intervening act that breaks the causal chain"); *Eli Lilly & Co. v. Revive Rx, LLC*, 812 F. Supp. 3d 708, 735 (S.D. Tex. 2025) (rejecting argument that prescribing physicians "mediate[]" the effects of compounder's conduct).

Lilly has plausibly alleged that Legendary's illegal retatrutide sales divert customers who would otherwise buy Lilly's medicines. That injury is sufficient to establish standing under both Article III and state unfair competition laws, and Legendary has failed to show otherwise.

2. *Legendary Poisons the Market for Lilly's Retatrutide.*

Legendary's illegal sales also harm Lilly by poisoning the market for Lilly's lawful retatrutide. That injury is "actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan*, 504 U.S. at 560; Mot. 14–16 (explaining state unfair competition laws require an "actual loss" to Lilly

---

2 Legendary also asserts that Lilly suffers no cognizable injury because "[a] consumer cannot ask her physician for a Lilly retatrutide medicine that does not exist." Mot. 18. Lilly's injury does not depend on anyone requesting a retatrutide prescription. The lost sale Lilly alleges is a sale of MOUNJARO®, ZEPBOUND®, or FOUNDAYO™—medicines that do exist.

caused by Legendary); *see also Hinchcliffe v. American Motors Corp.*, 440 A.2d 810, 814 (Conn. 1981) (defining an "ascertainable" loss under the Connecticut Unfair Trade Practices Act as one "capable of being discovered, observed, or established"); *Keating v. Nordstrom, Inc.*, 2019 WL 7160384, at *4 n.41 (D. Alaska Nov. 8, 2019) (citing *Hinchcliffe* and explaining that under the Alaska Unfair Trade Practices Act, a "loss is ascertainable if it is measurable"); *Discover Bank v. Morgan*, 363 S.W.3d 479, 496 & n.33 (Tenn. 2012) (same for Tennessee Consumer Protection Act). Legendary's conduct has resulted in an actual, measurable loss to Lilly because it harms the reputation of a medicine Lilly has invested significant resources to research and develop and forced Lilly to expend further resources to rehabilitate its reputation. Compl. ¶¶ 4 & n.3, 29–31, 38, 63.

Retatrutide is no speculative venture: after a decade of development, it has already succeeded in multiple Phase 3 trials and remains in several more that "have produced powerful data." Compl. ¶¶ 4 & n.3, 29–31. But because no retatrutide medicine is yet lawfully available, "consumers' first experiences with retatrutide are occurring exclusively through black-market sellers like Legendary Peptides." *Id.* ¶ 62. Consumers who suffer adverse events—"as many already have"—blame "all products containing retatrutide" and are "unlikely ever to try retatrutide again," including the lawful version Lilly is preparing to bring to market. *Id.* Each such event is "a permanent loss of future Lilly patients," *id.*, and the public accounts that follow "will deter other potential consumers," forcing Lilly to "rehabilitat[e] a product that has been tarnished by Legendary Peptides' unlawful conduct," *id.* ¶ 63. That harm falls on Lilly in particular: its retatrutide "is the only formulation with clinical data," *id.* ¶ 53, and Legendary "free rides on Lilly's innovation[,] research[,] and development while bearing none of the costs," *id.* ¶ 6. Legendary is wrong to argue that this injury is "neither actual nor imminent." Mot. 12–13, 19.

Legendary argues that Lilly's injury cannot be actual or imminent because Lilly's retatrutide has not yet been approved by FDA. *Id.* 12–13. But courts routinely recognize that a product in development can be injured by a competitor's conduct. In *Upjohn Co. v. Riahom Corp.*, for example, the court enjoined a competitor's false advertising even though Upjohn's minoxidil product—after eight years of development, including human clinical trials—was still awaiting FDA approval. 641 F. Supp. at 1214. Upjohn showed the same irreparable injury Lilly alleges: consumers "dissatisfied with the [competitor's] product or injured by it may avoid [Upjohn's product] out of the assumption that all minoxidil-based hair products share the same shortcomings." *Id.* at 1225. The court was explicit that the pending approval was no obstacle: Upjohn "still may obtain relief . . . although [its product] is not yet on the market (and may never be if it does not win FDA approval)." *Id.* at 1225 n.18. Likewise, FDA approval is no bar to the injury Lilly alleges here. Compl. ¶¶ 62–63.

Rather than treating future FDA approval as an absolute bar to Article III or statutory standing, courts assess whether a plaintiff has shown "intent and preparedness to enter the market," including "adequate background and experience in the new field, sufficient financial capability to enter it, and the taking of actual and substantial affirmative steps toward entry." *Andrx Pharms.*, 256 F.3d at 806–08 (recognizing, for standing purposes, that "even before the FDA approved" its application, the plaintiff could make the required showing of "intent and preparedness") (quoting *Hecht v. Pro-Football, Inc.*, 570 F.2d 982, 994 (D.C. Cir. 1977)); *see also Retrophin, Inc. v. Questcor Pharms., Inc.*, 41 F. Supp. 3d 906, 915 (C.D. Cal. 2014) ("[T]he necessity of FDA approval under these circumstances does not render the alleged harm too speculative."); *Amgen, Inc. v. F. Hoffmann-La Roche Ltd.*, 480 F. Supp. 2d 462, 467–68 (D. Mass. 2007) (rejecting argument that "absence of regulatory approval" broke the causal chain); *Seattle Children's Hosp.*

*v. Akorn, Inc.*, 2011 WL 6378838, at *8 (N.D. Ill. Dec. 20, 2011) (rejecting argument that generic manufacturer's lack of "tentative approval" from FDA defeated Article III jurisdiction); *Tawfilis v. Allergan, Inc.*, 157 F. Supp. 3d 853, 865–69 (C.D. Cal. 2015) (denying motion to dismiss for lack of standing where plaintiffs' injury was premised on market entry by a competitor whose product had not yet received FDA approval). Lilly alleges all three: its 150-year history of pioneering drug discoveries, including other medicines targeting overlapping hormone receptors; an effective IND for retatrutide; and multiple successful Phase 3 trials. Compl. ¶¶ 4 & n.3, 24–32.

None of the cases Legendary cites are to the contrary. In *AstraZeneca Pharms. LP v. Becerra*, for example, plaintiff challenged Medicare drug-pricing guidance that allegedly "disincentiviz[ed]" the plaintiff from developing new uses for an existing ingredient. 719 F. Supp. 3d 377, 388 (D. Del. 2024). But the plaintiff was not currently developing any new uses and might never do so. *Id.* at 387–88; *see also Lujan*, 504 U.S. at 564 ("'[S]ome day' intentions—without any description of concrete plans"—do not confer standing). Lilly, by contrast, has spent a decade developing and testing retatrutide. Compl. ¶¶ 29–30.

The other cases Legendary cites involve potential harm from hypothetical future competitors, not a specific defendant's current actions. In *Great Lakes Dredge & Dock Co. v. Magnus*, for instance, a dredging company challenged an agency ruling that, it claimed, would someday let foreign vessels compete for its work. 128 F.4th 678, 682 (5th Cir. 2025); *see also ViroPharma, Inc. v. Hamburg*, 777 F. Supp. 2d 140, 145–46 (D.D.C. 2011) (no standing where injury depended not just on future FDA approval, but also on FDA adopting regulatory interpretation it was still considering), *aff'd*, No. 11-5143 (D.C. Cir. Mar. 21, 2012); *cf. Nat'l Infusion Ctr. Ass'n v. Becerra*, 116 F.4th 488, 499 (5th Cir. 2024) (finding economic injury to support standing where plaintiff was "currently subject to" the challenged program). Here,

Legendary is already selling illegal retatrutide and already damaging the market for a product that Lilly is actively developing. Compl. ¶¶ 44, 61–63; *see also Upjohn*, 641 F. Supp. at 1225 & n.18 (drug developer injured by competitor's current conduct although its product "may never be" on the market "if it does not win FDA approval").

Because Lilly has plausibly alleged actual, ascertainable injuries to the reputation and future sales of its retatrutide that are both present and imminent, it has established another basis for Article III standing and standing under the state statutes at issue.

3. *Legendary's Retatrutide Harms Lilly's Reputation.*

Legendary's conduct does not just poison the market for Lilly's future retatrutide medicine; it harms Lilly's broader brand reputation today. Lilly developed retatrutide, and Lilly's retatrutide "is the only formulation with clinical data." Compl. ¶¶ 29–30, 53. So when Legendary sells the molecule, it necessarily "trades on the reputation and clinical data associated with Lilly's products and retatrutide." *Id.* ¶ 64. Each of Legendary's retatrutide sales exposes customers to an untested, unproven illegal drug, *id.* ¶ 57, and the risks posed by these sales are stark: illegal drugs sold within the black market for "research use only" retatrutide that Legendary participates in have produced emergency-room visits, hospitalizations, and at least 16 FDA warning letters. *Id.* ¶¶ 8, 37, 40–41. Each Legendary sale thus poses a real and imminent risk that purchasers will be harmed and, as the only company whose work and data stand behind the molecule, each sale also creates a real and imminent risk of damage to "Lilly's brand and the public's confidence in Lilly's products and pipeline." *Id.* ¶ 64. Indeed, before any lawful retatrutide medicine has been sold, Lilly has already had to publicly warn consumers about the dangers of illegal products claiming to be or contain retatrutide. *Id.* ¶ 38. It is well-established that using the "millions of dollars [plaintiff invested] into developing its products" to "sell an allegedly inferior" product causes "injury to a commercial

interest in reputation or sales." *Obesity Rsch. Inst., LLC v. Fiber Rsch. Int'l, LLC*, 310 F. Supp. 3d 1089, 1112, 1115 (S.D. Cal. 2018) (finding standing).

Lilly is therefore at imminent risk of an injury cognizable under both Article III and state law: "'[R]eputational harms,' as a general matter, are classic Article III injuries." *Bost*, 607 U.S. at 78 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021)); *see also, e.g., Geiger v. C&G of Groton, Inc.*, 424 F. Supp. 3d 276, 296-97 (D. Conn. 2019) (holding that plaintiffs' allegations of reputational harm were adequate to establish standing under the Connecticut Unfair Trade Practices Act); *Ambach*, 216 P.3d at 408 (explaining that "loss of professional or business reputation" is a cognizable injury under the Washington Consumer Protection Act); *Lexmark*, 572 U.S. at 131–32 ("an injury to a commercial interest in reputation or sales" is sufficient for statutory standing). So is "the need to take … affirmative steps to avoid the risk of harm to [one's] reputation." *Meese v. Keene*, 481 U.S. 465, 475 (1987).

*Bay Area Unitarian Universalist Church v. Ogg*, which Legendary cites, Mot. 14, *agrees* "reputational harm" is a "harm traditionally recognized as providing a basis for a lawsuit." 185 F.4th 523, 536 (5th Cir. 2026) (en banc) (quoting *TransUnion*, 594 U.S. at 432). Plaintiff in that case had simply not shown it suffered that harm from "a few adverse customer reviews." *Id. Barber v. Bryant* is equally off point. Mot. 14 (citing 860 F.3d 345, 357 (5th Cir. 2017)). Plaintiffs in that case objected to a state statute but had no plans to engage in conduct the statute covered, only suggesting a "possible future injury." 860 F.3d at 357. And in *Precision Links Inc. v. USA Prods. Grp., Inc.*, plaintiff alleged only that "*if* the accused product malfunctions, the Plaintiff's goodwill will be tarnished." Mot. 19 (quoting 2009 WL 801781, at *3 (W.D.N.C. Mar. 25, 2009)).[3] Here,

---

[3] Legendary's citations to *Fleming v. Janssen Pharms., Inc.* and *Montes v. SPARC Grp. LLC* are even more irrelevant. *See* Mot. 19 (citing 186 F. Supp. 3d 826, 834 (W.D. Tenn. 2016) and 586 P.3d 999, 1005, 1008 (Wash. 2026) (en banc)). In *Fleming*, the court dismissed the claim because "nothing in the record" showed plaintiff's expenditures on the drug, not because the injury was incognizable. 186 F. Supp. 3d at 834. And in *Montes*, the

Lilly alleges that Legendary is *currently* selling illegal retatrutide for human use as part of a "dangerous and growing black market" in retatrutide that is already harming the public and leading it to associate the molecule Lilly spent years developing with those harms, "damaging Lilly's brand and the public's confidence in Lilly's products and pipeline." Compl. ¶¶ 5, 8, 29–31, 33–34, 37, 40–41, 49, 62–64. That is the kind of reputational harm courts have recognized as a concrete injury. *See Meese*, 481 U.S. at 473–76 (holding plaintiff had standing where exhibiting films the government had labeled "political propaganda" risked "public formation of an association between 'political propaganda' and his reputation").

Nor is this asserted harm speculative just because retatrutide is not yet FDA approved. Mot. 13–14. Legendary's conduct certainly poisons the well for Lilly's future products, *see supra*, but it also harms present goodwill belonging to Lilly itself, a company whose medicines, including FDA-approved obesity and diabetes treatments, help more than 70 million people worldwide. Compl. ¶¶ 24–28. Legendary "trades on the reputation and clinical data associated with Lilly's products and retatrutide": Lilly has produced powerful clinical data demonstrating the effectiveness of retatrutide for weight loss, *id.* ¶¶ 4, 53; this data has generated consumer demand for retatrutide, *id.* ¶ 33; and Legendary capitalizes on that demand by selling retatrutide to consumers as a "tool" for achieving health and fitness goals, *id.* ¶¶ 44, 48. Because Legendary exploits customers' association of its illegal retatrutide with Lilly's research and products, the harms Legendary's products cause damage "Lilly's brand and the public's confidence in Lilly's products and pipeline." *Id.* ¶ 64. That is injury to goodwill Lilly has built over 150 years, not to a future product. *Id.* ¶ 24. Legendary points out that Lilly does not allege "that its name appears on

---

court held a shopper's disappointment was not cognizable, but acknowledged "loss of business goodwill" was. 586 P.3d at 1005. Lilly alleges a loss of business goodwill.

any Legendary product," Mot. 13, but Lilly's injury does not depend on consumers confusing sellers with Lilly. It depends on consumers associating the harms black-market retatrutide causes with the company—Lilly—that developed the molecule. Compl. ¶¶ 62–64. Reputational harm of that kind does not require confusion over who made a product. *Cf. Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1344–45 (Fed. Cir. 2013) ("Even absent consumer confusion ... there can still be harm to a company's reputation").

Legendary next assumes that Lilly must identify a Legendary customer who "experienced an adverse event, attributed it to Lilly, or declined a Lilly product as a result." Mot. 13–14. That assumption is wrong. Lilly need not identify specific customers at the pleading stage, because "general factual allegations of injury resulting from the defendant's conduct may suffice." *Lujan*, 504 U.S. at 561. Legendary's own authority shows that: in *Lexmark* plaintiff adequately pled reputational harm not by enumerating specific affected consumers, but by alleging defendant led "consumers and others in the trade to believe that [plaintiff] is engaged in illegal conduct." *Lexmark*, 572 U.S. at 123; *see* Mot. 16, 18 (citing *Lexmark*); *see also, e.g.*, *Obesity Rsch. Inst.*, 165 F. Supp. 3d at 947 (finding proximate causation and statutory standing based on allegation that plaintiff had been "injured by the loss of good will" without specific identified consumers). Which of Legendary's customers have suffered adverse events is information particularly within Legendary's knowledge and Lilly does not have to plead that detail. *See Innova*, 892 F.3d at 730.

Nor does Lilly have to show that Legendary's customers have already been harmed; the "material risk of future harm can satisfy the concrete-harm requirement." *TransUnion*, 594 U.S. at 435. Legendary's decision to sell an illegal drug produced outside FDA oversight creates such a material risk of future harm. Compl. ¶ 34; *see Mochi*, 2026 WL 1076831, at *4 (holding that Lilly established injury in fact where it alleged reputational harm based on higher rates of adverse

events among users of non-FDA-approved drugs). Consumers of black-market retatrutide have already suffered adverse health events, including emergency-room visits and hospitalizations. Compl. ¶¶ 40–41. They blame the molecule rather than the seller, and they broadcast those experiences "on Reddit, on social media, and in personal networks." *Id.* ¶¶ 62–63. The result is a public conditioned "to associate retatrutide with danger and harm." *Id.* ¶ 7. Allegations of that kind—a documented pattern of adverse events and public attribution across an unlawful market—"permit a reasonable inference of harm to Lilly's reputation." *Mochi*, 2026 WL 1076831, at *4, *7 (finding Article III and statutory standing for a claim against one of many sellers of compounded GLP-1 inhibitors where studies showed a "higher incidence of adverse side effects among users of compounded GLP-1 inhibitors").[4]

Lilly has plausibly alleged that each of Legendary's illegal sales creates a concrete and imminent risk to Lilly's reputation. That is a third cognizable injury establishing Article III and statutory standing.

**B. Legendary's Illegal Sales Are Actionable**

Legendary also challenges Lilly's Texas common-law claim. Texas common law allows an unfair competition suit for an "illegal act … which interfered with the plaintiff's ability to conduct its business." *Taylor Pub. Co. v. Jostens, Inc.*, 216 F.3d 465, 486 (5th Cir. 2000). Lilly has alleged exactly that: Legendary illegally sells unapproved retatrutide products, Compl. ¶ 120, and those illegal sales of an investigational molecule Lilly developed are harming Lilly, *see, e.g.*, *id.* ¶ 61; *see id.* ¶¶ 62–64, 122.

[4] Legendary cites the same court's earlier decision dismissing Lilly's original complaint, where the reputational theory rested on a "lone internet post by an unidentified individual." Mot. 17 (quoting *Eli Lilly & Co. v. Mochi Health Corp.*, 2025 WL 2998166, at *3 (N.D. Cal. Oct. 24, 2025)). That decision was overtaken by this one, and, regardless, Lilly's Complaint here alleges far more: emergency-room visits, hospitalizations, at least 16 FDA warning letters, and public accounts attributing those harms to retatrutide. Compl. ¶¶ 8, 37, 40–41, 62–63.

Legendary disputes that on two grounds. *First*, Legendary asserts without support or explanation that Lilly failed to plead that Legendary's illegal sales interfere with Lilly's business. Mot. 20. That ignores the Complaint, which explains that Legendary's conduct harms Lilly by, among other things, diverting customers from Lilly's FDA-approved medicines and "costing Lilly sales," Compl. ¶ 61; *see id.* ¶¶ 62–64, 122. Texas law and Rule 12(b)(6) require nothing more. *See, e.g.*, *W. Rsrv. Medtec Servs., LLC v. Stryker Corp.*, 2019 WL 13191641, at *2 (S.D. Tex. May 13, 2019) (plaintiff sued for unfair competition based on defendant's diversion of its customer); *Featherstone v. Indep. Serv. Station Ass'n of Texas*, 10 S.W.2d 124, 124 (Tex. Civ. App.—Dallas 1928, no writ) (plaintiff sued for unfair competition based on "an alleged lottery scheme employed by the defendants to attract business and trade from plaintiff").

*Second*, Legendary cites *Revive* for the claim that Lilly must also show "the Legislature intended the statute to supply a cause of action or standard of care for a civil-tort claim . . . ." Mot. 20 (citing *Revive*, 812 F. Supp. 3d at 726). But *Revive* erred in that holding. The *Southend* court declined to follow *Revive*, and this Court should too. Order, *Eli Lilly & Co. v. AP Max Inc. d/b/a Southend Pharmacy*, No. 4:25-cv-05051 (S.D. Tex. Apr. 17, 2026), Dkt. No. 47 (denying motion to dismiss Texas unfair competition claim).

*Revive* erred because it confused two distinct lines of case law, citing cases about negligence *per se* and implied private rights of action rather than unfair competition cases. 812 F. Supp. 3d at 726–29 (citing *Morrison v. Quarrington*, 2024 WL 2858838, at *9 (Tex. App.—Tyler May 15, 2024, pet. denied) (negligence *per se*); *Perry v. S.N.*, 973 S.W.2d 301, 305 (Tex. 1998) (same); *Nichols v. McKinney*, 553 S.W.3d 523, 531 (Tex. App.—Waco 2018, pet. denied) (same); *Texas Med. Res., LLP v. Molina Healthcare of Texas, Inc.*, 659 S.W.3d 424, 432 (Tex. 2023) (implied private right of action); *Brown v. De La Cruz*, 156 S.W.3d 560, 567 (Tex. 2004) (same)).

The predicates for negligence *per se* and unfair competition are different: negligence *per se* requires proof that the Texas legislature "intended the statute to supply a cause of action or standard of care for a civil-tort claim," *Revive*, 812 F. Supp. 3d at 726 (citations omitted), while statutory violations can presumptively be predicates for an unfair competition tort unless that "would be inconsistent with" legislative intent, *see Reliable Ambulance Serv., Inc. v. Mercy Hosp. of Laredo*, 2003 WL 21972724, at *6 (Tex. App.—San Antonio Aug. 20, 2003, pet. denied) (assessing whether unfair competition claim "would be inconsistent with the intent of Congress."). Here, there is no such inconsistency.

Legendary and the *Revive* court suggest that the Texas Food, Drug, and Cosmetic Act's ("FDCA") "comprehensive regulatory scheme" implies that the legislature did not intend to allow unfair competition claims. Mot. 20 (citing *Revive*, 812 F. Supp. 3d at 726–27). But the case law makes clear that statutes with enforcement regimes—including *criminal statutes*—can be unfair competition predicates. *Schoellkopf v. Pledger*, 778 S.W.2d 897, 904 (Tex. App.—Dallas 1989, writ denied) (predicate acts include those "denounced as wrongful by the penal code"); *Taylor Pub. Co.*, 216 F.3d at 486 & n.15 (rejecting unfair competition claim for failure to show a "tort or criminal act"); *W. Rsrv. Medtec Servs.*, 2019 WL 13191641, at *8 (predicate "illegal act need not necessarily violate criminal law"); *Decorative Ctr. of Houston, L.P. v. Direct Response Publications, Inc.*, 208 F. Supp. 2d 719, 735 (S.D. Tex. 2002) (same).

The *Revive* court also relied on the narrowness of the Texas Deceptive Trade Practices Act (DTPA), reasoning that since only "consumers, not competitors … may enforce" that act, Texas' legislature had made a "deliberate choice[]" not to "make actionable violations of the state food-and-drug laws." 812 F. Supp. 3d at 729. But when that Act was passed, such violations were already actionable at common law by competitors, while the DTPA was necessary to allow

consumers to sue. *See, e.g.*, *Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 825 (Tex. 2012) ("one of [DTPA's] primary purposes" was "to provide consumers a cause of action"). The DTPA was passed in 1973. *See Woods v. Littleton*, 554 S.W.2d 662, 663 n.1 (Tex. 1977). Claims for unfair competition under Texas common law have existed for far longer. *See, e.g.*, *Featherstone*, 10 S.W.2d at 128. The DTPA should not be interpreted to abrogate those protections, because it explicitly did not: its remedies are "in addition to any other procedures or remedies." TEX. BUS. & COM. CODE ANN. § 17.43. Because Lilly has alleged that Legendary interferes with its business by violating Texas' FDCA, it has stated a claim under Texas law.

## VI. CONCLUSION

For these reasons, Lilly respectfully requests that the Court deny Defendant's Motion to Dismiss in its entirety. In the alternative, Lilly respectfully requests leave to amend.

Dated: November 16, 2026

Respectfully submitted,

*/s/ James John Lomeo*

James John Lomeo
Texas Bar No. 24118993
KIRKLAND & ELLIS LLP
401 West 4th Street
Austin, TX 78701
Telephone: (512) 355-4316
Facsimile: (512) 678-9101
james.lomeo@kirkland.com

Diana M. Watral (*pro hac vice*)
James R.P. Hileman (*pro hac vice*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
diana.watral@kirkland.com
james.hileman@kirkland.com

David I. Horowitz (*pro hac vice*)
KIRKLAND & ELLIS LLP
2049 Century Park East, Suite 3700
Los Angeles, CA 90067
Telephone: (213) 680-8374
Facsimile: (310) 552-5900
dhorowitz@kirkland.com

Chase Chesser (*pro hac vice*)
KIRKLAND & ELLIS LLP
150 3rd Avenue South, Suite 1220
Nashville, TN 37201
Telephone: (629) 222-0131
Facsimile: (629) 222-0101
chase.chesser@kirkland.com

*Counsel for Plaintiff Eli Lilly and Company*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 16th day of November 2026, a true and correct copy of the above was electronically filed with the Clerk of Court using the CM/ECF system, which sends notifications of such filing to all counsel of record who have consented to accept service by electronic means.

*/s/ James John Lomeo*
James John Lomeo